IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRENT LUIS GONZALEZ,<br><br>     Plaintiff,<br><br>  v.<br><br>Z. AHMED, M.D., et al.,<br><br>     Defendants. | No. C 10-5654 LHK (PR)<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; REFERRING CASE TO PRO SE PRISONER SETTLEMENT PROGRAM<br><br>(Docket No. 57.) |

Plaintiff, a state prisoner proceeding *pro se*, filed an amended complaint ("AC") under 42 U.S.C. § 1983, arguing that Defendants retaliated against him, and were deliberately indifferent to his serious medical needs, in violation of the First and Eighth Amendments. On November 14, 2011, Defendants filed a motion for summary judgment. Plaintiff has filed an opposition and supporting documents, and Defendants have filed a reply.[1] Having carefully considered the papers submitted, the Court GRANTS in part and DENIES in part Defendants' motion for summary judgment.

---

[1] On July 16, 2012, the Court offered Plaintiff the opportunity to file a supplemental opposition, in light of *Woods v. Carey*, 684 F.3d 934, 939-41 (9th Cir. 2012). Plaintiff has not filed a supplemental opposition.

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring Case to Pro Se Prisoner Settlement Program
G:\PRO-SE\SJ.LHK\CR.10\Gonzalez654msjdeny.wpd

**BACKGROUND**

Plaintiff filed this action, alleging that Defendants were deliberately indifferent to his serious medical needs, and retaliated against him, which resulted in harm to the Plaintiff. In response, Defendants argue that they are entitled to summary judgment as a matter of law because their actions were reasonable, and because they are entitled to qualified immunity.

The following facts are taken in the light most favorable to Plaintiff unless otherwise indicated. Defendant Dr. Z. Ahmed ("Dr. Ahmed") was Plaintiff's primary care physician at Central Training Facility ("CTF"). (Decl. Ahmed at ¶ 3.) Defendant Dr. Sepulveda ("Dr. Sepulveda") was the Chief Physician and Surgeon at CTF, whose duties included investigating inmate appeals regarding staff complaints and medical treatment. (Decl. Sepulveda at ¶ 2.) Defendant Dr. Chudy ("Dr. Chudy") was the Chief Medical Officer at CTF. (AC at 7.)[2]

On July 7, 2008, Plaintiff submitted a request for medical services because he was having severe abdominal pain in his lower right abdominal region and groin area, and had been experiencing nausea and loss of appetite for about five days. (AC at 7.) One or two days later, Plaintiff went to "sick call" for this same issue at CTF North Facility Medical Annex. (*Id.*; Pl. Depo. at 10.) Plaintiff told the nurse that he was experiencing a lot of pain, and had been for about a week. (AC at 7.) Plaintiff also told the nurse that he felt nauseous and had a loss of appetite. (Pl. Decl. at ¶ 4.) The nurse scheduled Plaintiff for an appointment with Dr. Ahmed on July 17, 2008. (AC at 7.) By the time Plaintiff saw Dr. Ahmed, it was very painful for Plaintiff to make even the smallest of movements, it hurt when he urinated, and he was developing a cough. (*Id.* at 8.)

At this point, the parties' versions of events differ. According to Plaintiff, on July 17, 2008, when Plaintiff tried to explain these pains and symptoms to Dr. Ahmed, Dr. Ahmed was sarcastic, dismissive, and mocking. (*Id.*) When Plaintiff tried to show Dr. Ahmed where he was feeling pain, Dr. Ahmed did not examine him at all, but instead, stated, "You are okay. Nothing is wrong with you," and then turned away and began writing in his notes. (*Id.*) Plaintiff begged

---

[2] The page numbers cited in the AC correspond with the pagination as indicated on ECF.

Dr. Ahmed to examine him, but Dr. Ahmed merely dismissed him. (*Id.*) Plaintiff threatened that he would have to file an administrative grievance so that he could receive a proper examination, and Dr. Ahmed threatened Plaintiff with a disciplinary write-up for "wasting his time," and "making a joke." (*Id.*) Plaintiff left Dr. Ahmed's office without a medical examination or relief. (*Id.* at 8-9.) Plaintiff asserts that, at no time did Dr. Ahmed ever ask if he was experiencing nausea, vomiting, diarrhea, or constipation, nor did Plaintiff ever deny that he had those symptoms. (Pl. Decl. at ¶ 7.) In fact, Plaintiff states that he had been experiencing all those symptoms on that day. (*Id.*)

According to Dr. Ahmed, at Plaintiff's appointment on July 17, 2008, Dr. Ahmed wanted to rule out possible issues associated with abdominal pain, such as appendicitis, and asked Plaintiff if he was experiencing any symptoms such as diarrhea, constipation, vomiting, or nausea. (Decl. Ahmed at ¶ 6.) Dr. Ahmed states that Plaintiff denied having those symptoms. (*Id.*) Dr. Ahmed also states that there were no other symptoms suggestive of appendicitis, such as tenderness, rigidity, or inflammation around the abdomen. (*Id.*) Thus, Dr. Ahmed determined that Plaintiff did not need extra testing at that time, but directed Plaintiff to report to sick call if he experienced any nausea, vomiting, diarrhea, constipation, or fever. (*Id.*; Defs.' Appendix, Ex. E.)

Plaintiff's condition worsened over the next few days, and his pain was so unbearable that Plaintiff felt as if he were dying. (AC at 9.) On July 21 and July 22, 2008, Plaintiff submitted two separate requests for medical assistance, and on the second request, wrote "emergency" on the form because he was in fear for his life. (*Id.*; Opp., Ex. D.) The requests indicated that Plaintiff was unable to eat due to the pain, and that Plaintiff was nauseous and breaking out in sweats. (Pl. Decl. at ¶ 14.) Both forms also requested a different doctor because Dr. Ahmed had refused to examine him at the earlier appointment. (*Id.*; Pl. Decl. at ¶¶ 11-15.) Here again, the parties' stories differ.

According to Plaintiff, a few hours later, on July 22, 2008, Plaintiff was seen by Nurse Roy, who agreed that Plaintiff needed immediate attention. (AC at 9; Pl. Decl. at ¶ 16.) Nurse

1  Roy walked a few feet down to Dr. Ahmed's office to speak with Dr. Ahmed on Plaintiff's
2  behalf. (AC at 9.) Nurse Roy returned and informed the Plaintiff that Dr. Ahmed did not want
3  to see him, that Dr. Ahmed stated that he had already tended to Plaintiff, and that Dr. Ahmed
4  said "nothing [was] wrong with [Plaintiff]." (*Id.*) At Plaintiff's urging, Nurse Roy attempted
5  again to have Dr. Ahmed look at Plaintiff, but was unsuccessful. (*Id.*) Dr. Ahmed did not want
6  to see Plaintiff until his next scheduled appointment a few days later. (*Id.* at 10.)

7  According to Dr. Ahmed, Nurse Roy told him about Plaintiff's condition, and Dr. Ahmed
8  informed Nurse Roy that Plaintiff was scheduled for a follow-up exam on July 25, 2008. (Decl.
9  Ahmed at ¶ 8.) Because Plaintiff was "not experiencing any of the symptoms associated with
10 appendicitis, or any other serious medical condition, he did not require any additional treatment
11 at this time." (*Id.*)

12 Thereafter, Plaintiff's condition worsened so much that he was mostly confined to his
13 bed in pain with a fever, coughing, vomiting, shivering, and frequent painful urination. (AC at
14 10.) Plaintiff also was unable to eat. (*Id.*) On July 24, 2008, Plaintiff could no longer withstand
15 the pain, and informed Unit Officer McFarland. (*Id.*) Plaintiff was taken to the medical center at
16 CTF. (*Id.*) Dr. Ahmed examined Plaintiff at the clinic, and reviewed Plaintiff's chart. (Decl.
17 Ahmed at ¶ 9.) In the chart, Dr. Ahmed noticed that three weeks prior, Plaintiff reported to a
18 nurse that he had attempted to insert a packet of tobacco into his rectum. (*Id.*; Pl. Decl. at ¶ 18.)
19 Plaintiff alleges that it did not fully penetrate his rectum, and he immediately removed it because
20 it was uncomfortable. (Pl. Decl. at ¶¶ 18, 20.) Dr. Ahmed reports that after he learned that
21 Plaintiff had inserted something into his rectum, and observed that Plaintiff's abdominal area
22 was tender, Plaintiff's tongue was moist, and Plaintiff displayed a fever, Dr. Ahmed believed
23 that Plaintiff might have perforated his rectum, and ordered Plaintiff to the Natividad Medical
24 Center Emergency Room. (Decl. Ahmed at ¶ 10.)

25 Plaintiff was taken by emergency medical gurney and rushed to an ambulance which took
26 him to Natividad Hospital Emergency Room. (AC at 10.) Plaintiff was placed on IV tubes and
27 given CT scans and other tests. (*Id.*)

28

While at Natividad, Plaintiff was informed by one of the doctors that his appendix had burst a few weeks prior, and that the only thing that saved him was that his immune system was very strong because normally, the poison from a ruptured appendix would have infected Plaintiff's body and been fatal. (AC at 10.) While at Natividad, Plaintiff was directed to return between 6-8 weeks for an appendectomy. (*Id.* at 11.) Plaintiff remained at Natividad for seven days until July 31, 2008. (*Id.*) During that time, Plaintiff was connected to IV tubes and hospital equipment so that he could receive antibiotics for an abscess and infected appendix, and also morphine for the pain. (*Id.* at 10-11.) Plaintiff was told by another physician that, had he been examined properly, the appendicitis could have been detected earlier, and the abscess would have been avoided. (*Id.* at 11.) On July 31, 2008, Plaintiff was transferred back to CTF.

Upon Plaintiff's return to CTF, Dr. Kalisher took over as Plaintiff's primary care practitioner. (Opp. at 11.) On August 1, August 8, August 26, and September 9, 2008, Plaintiff had appointments with Dr. Kalisher, and on August 18, 2008, Plaintiff saw Dr. Moore. On all of those visits, Plaintiff expressed fear and concern about the possibility of returning to see Dr. Ahmed. (*Id.*)

Plaintiff was supposed to have follow-up appointments and surgery at Natividad. Dr. Kalisher informed Plaintiff that, because he was Dr. Ahmed's patient, Plaintiff would eventually have to return to Dr. Ahmed. (*Id.* at 11-12.) At Plaintiff's next appointment with Dr. Ahmed, Plaintiff told Dr. Ahmed that he no longer wanted to be Dr. Ahmed's patient. (*Id.*) Dr. Ahmed told Plaintiff that if Plaintiff refused to see him, then Plaintiff would not be able to have his appendectomy surgery. (*Id.*) Plaintiff asked Dr. Ahmed why he did not properly examine him on July 17, 2008, and Dr. Ahmed stated that it was because he saw Plaintiff at the end of the day, and Dr. Ahmed was tired. (*Id.*)

On September 9, 2008, Dr. Kalisher informed Plaintiff that she could no longer be Plaintiff's doctor, and that Dr. Ahmed would treat him. (Opp. at 12.) On September 11, 2008, Plaintiff returned for a follow-up appointment at Natividad with Dr. Distante, who ordered a CT-scan of Plaintiff's abdomen to determine whether the abscess had resolved. (Opp. at 13.) On

September 15, 2008, Dr. Ahmed followed-up on the status of Plaintiff's surgery. (Decl. Ahmed at ¶ 15.) Plaintiff received a CT-scan on September 24, 2008, and its results showed "no unresolved abscess or remaining infection" around the appendix. (Pl. Decl. at ¶¶ 40-41.)

On September 30, 2008, Plaintiff saw Dr. Ahmed, and it was confirmed that Plaintiff no longer had an infection or an abscess around his appendix. (Opp. at 14; Pl. Decl. at ¶ 43.) However, Dr. Ahmed made no note regarding such resolution, nor did he respond to Plaintiff's inquiry about when the surgery would be. (Opp. at 14.) On October 8, 2008, Plaintiff returned to Natividad for his pre-surgery appointment. (Pl. Decl. at ¶ 44.) The surgeon at Natividad examined Plaintiff and confirmed that the abscess was resolved, and determined that Plaintiff needed an appendectomy as soon as possible. (*Id.*)

On October 9, 2008, Plaintiff was interviewed by CTF Chief Physician Dr. Sepulveda in response to Plaintiff's administrative appeal against Dr. Ahmed, and Plaintiff asked to be released from Dr. Ahmed's care for fear of further harm. (*Id.*; AC at 12.) Dr. Sepulveda told Plaintiff that he must stay with Dr. Ahmed, and that Dr. Sepulveda would check into the status of Plaintiff's surgery. (*Id.* at 13.) Plaintiff never heard from Dr. Sepulveda after that. (*Id.*) On October 21, 2008, Dr. Chudy, CMO, was made aware of Plaintiff's complaints regarding Dr. Ahmed, but did nothing. (*Id.*)

Plaintiff claims that after September 30, 2008, Plaintiff was denied all medical care, and his surgery was unreasonably delayed until December 11, 2008. (Opp. at 19.) During that time, Plaintiff submitted approximately five requests for medical services, but none were ever answered. On December 11, 2008, Plaintiff was taken to Natividad Hospital for his appendectomy surgery. (AC at 13.)

**ANALYSIS**

I.   <u>Standard of Review</u>

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect

1  the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute
2  as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a
3  verdict for the nonmoving party. *Id.*

4        The party moving for summary judgment bears the initial burden of identifying those
5  portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine
6  issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Where the moving
7  party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no
8  reasonable trier of fact could find other than for the moving party. But on an issue for which the
9  opposing party will have the burden of proof at trial, as is the case here, the moving party need
10 only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.*
11 at 325.

12       Once the moving party meets its initial burden, the nonmoving party must go beyond the
13 pleadings, and by its own affidavits or discovery, "set forth specific facts showing that there is a
14 genuine issue for trial." Fed. R. Civ. P. 56(e). The Court is only concerned with disputes over
15 material facts, and "factual disputes that are irrelevant or unnecessary will not be counted."
16 *Liberty Lobby, Inc.*, 477 U.S. at 248. It is not the task of the Court to scour the record in search
17 of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The
18 nonmoving party has the burden of identifying, with reasonable particularity, the evidence that
19 precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the
20 moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

21       At the summary judgment stage, the Court must view the evidence in the light most
22 favorable to the nonmoving party: if evidence produced by the moving party conflicts with
23 evidence produced by the nonmoving party, the judge must assume the truth of the evidence set
24 forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152,
25 1158 (9th Cir. 1999).

26
27
28

II.     Legal Claims

    A.     Deliberate Indifference to Serious Medical Needs

Plaintiff claims that Dr. Ahmed exhibited deliberate indifference to his serious medical needs when he refused to examine Plaintiff on July 17, 2008, refused to see Plaintiff on July 22, 2008, and delayed Plaintiff's appendectomy surgery by nine weeks. Plaintiff also alleges that Dr. Sepulveda and Dr. Chudy are liable because they failed to take the necessary steps to prevent Plaintiff from returning to Dr. Ahmed's care, and to ensure that Plaintiff received a timely appendectomy.

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *See McGuckin*, 974 F.2d at 1059.

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* (citing *Estelle*, 429 U.S. at 104). The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment. *Id.* at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment. . . . Mere negligence in diagnosing or treating a medical condition, without more,

does not violate a prisoner's Eighth Amendment rights." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (internal quotations and citation omitted); *see Farmer*, 511 U.S. at 835-36 & n.4 (recognizing that neither negligence nor gross negligence will constitute deliberate indifference). A mere delay in medical treatment does not rise to the level of a constitutional violation without medical evidence of detrimental effect from the delay. *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (doctor entitled to summary judgment where plaintiff presented no evidence that delays were within the doctor's control or contributed to plaintiff's injuries).

Defendants argue that Plaintiff did not have a serious medical need. However, viewing the evidence in the light most favorable to Plaintiff, it is clear that Plaintiff's medical needs were serious. He alleged in his requests for medical services that he was experiencing severe pain in his abdomen and groin areas, to the point where he felt nauseous, could not eat or sleep, and this pain was getting increasingly worse for over two weeks before he was first able to see Dr. Ahmed. He had suffered a ruptured appendix and an infected abscess and was told by one of the doctors at Natividad that his appendix had ruptured a few weeks prior. This is the kind of injury that a doctor would find noteworthy.

The next question is whether Dr. Ahmed was deliberately indifferent to this serious medical need. The parties' versions of events differ starkly. Plaintiff alleges that Dr. Ahmed refused to examine or treat him at all in the first visit. Instead, Dr. Ahmed mocked him and insisted that Plaintiff was fine. Then, when Plaintiff filed an emergency request for medical services, and Nurse Roy requested on Plaintiff's behalf that Dr. Ahmed tend to Plaintiff, Dr. Ahmed again refused to see Plaintiff, insisting that nothing was wrong with the Plaintiff.

At summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). A Court may not disregard direct evidence on the ground that no reasonable jury would believe it. *See id.* (where nonmoving party's direct evidence raises genuine issues of

fact but is called into question by other unsworn testimony, district court may not grant summary judgment to moving party on ground that direct evidence is unbelievable).

With this standard in mind, and viewing the facts in the light most favorable to Plaintiff, there is an inference that Dr. Ahmed's responses to Plaintiff on July 17 and July 22, 2008, were purposeful failures to act. *See McGuckin*, 974 F.2d at 1060. Further, there is sufficient evidence to support a finding that Plaintiff was harmed by Dr. Ahmed's failure to act. *See id.* Plaintiff stated that a doctor at Natividad told him that, had Plaintiff been properly diagnosed when he visited Dr. Ahmed, the appendicitis would have been detected, the abscess avoided, and Plaintiff would not have had to face a large abscess and infection. This evidence, viewed in the light most favorable to Plaintiff, is enough to create a factual dispute as to whether Dr. Ahmed exhibited deliberate indifferent to Plaintiff's serious medical needs.

Alternatively, Defendants argue that Dr. Ahmed is entitled to qualified immunity. However, the Court finds granting summary judgment on the ground of qualified immunity is improper in this case. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A Court considering a claim of qualified immunity must determine: (1) whether the Plaintiff has alleged the deprivation of an actual constitutional right, and (2) whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009). The Court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. *Id.* Granting summary judgment on the ground of qualified immunity is "improper if, under the plaintiff's version of the facts, and in light of the clearly established law, a reasonable officer could not have believed his conduct was lawful." *Schwenk v. Hartford*, 204 F.3d 1187, 1196 (9th Cir. 2000). Here, under Plaintiff's version of the facts, no reasonable officer could believe that Dr. Ahmed's actions were lawful under the Eighth Amendment.

Next, Plaintiff alleges that Drs. Sepulveda and Chudy are liable as supervisors for allowing Plaintiff to return to the care of Dr. Ahmed. A supervisor may be liable under section 1983 upon a showing of (1) personal involvement in the constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Henry A. v. Willden*, 678 F.3d 991, 1003-04 (9th Cir. 2012) (citing *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). A supervisor therefore generally "is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Drs. Sepulveda and Chudy became aware of Plaintiff's complaints about Dr. Ahmed in October 2008.

As an initial matter, there is no constitutional right to a prison administrative appeal or grievance system. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003). An incorrect decision on an administrative appeal, or failure to handle it in a particular way, therefore, did not amount to a violation of Plaintiff's constitutional rights. Further, Drs. Sepulveda and Chudy became aware of Plaintiff's dissatisfaction with Dr. Ahmed in conjunction with Plaintiff's administrative appeal on October 9, 2008, the date Dr. Sepulveda interviewed Plaintiff,[3] and October 21, 2008, the date Dr. Chudy partially granted Plaintiff's appeal. Both dates were *after* Dr. Ahmed allegedly refused to treat Plaintiff, and *after* Plaintiff was already treated at Natividad for his abscess. To survive a motion for summary judgment, Plaintiff must demonstrate that Drs. Sepulveda and Chudy knew that Plaintiff was facing a substantial risk of serious harm by continuing to receive treatment by Dr. Ahmed, and then disregarded that risk. Here, no reasonable trier of fact could find that Drs. Sepulveda or Chudy had any personal involvement in the incidents because neither was aware of Dr. Ahmed's refusal to examine or treat Plaintiff, nor is there evidence that either knew about Plaintiff's trip to the emergency room until after those

---

[3] Although Plaintiff submits that Dr. Sepulveda knew about Plaintiff's complaints on September 9, 2008, the date that Plaintiff submitted his appeal, there is no evidence that Dr. Sepulveda became aware of Plaintiff's claim until October 9, 2008, the date he interviewed Plaintiff.

events had already occurred. *See, e.g.*, *Edgerly v. City and County of San Francisco*, 559 F.3d 946, 961 (9th Cir. 2010) (no liability for supervisor police officer based on personal involvement because evidence showed he was not aware of arrest or search until after they were completed and he authorized officers to cite and release plaintiff). Nor is there evidence of a sufficient causal connection between Drs. Sepulveda and Chudy and Dr. Ahmed's alleged constitutional violations against Plaintiff. *See, e.g.*, *id.* Thus, there is an absence of evidence that Drs. Sepulveda or Chudy were deliberately indifferent to Plaintiff's serious medical needs, or that they knew about and failed to prevent constitutional violations against Plaintiff. Accordingly, Defendants' motion for summary judgment is granted as to this portion of the deliberate indifference claim against Drs. Sepulveda and Chudy.[4]

Next, Plaintiff alleges that all Defendants are liable for the delay in receiving his appendectomy surgery. However, there is an absence of evidence that Defendants' action or lack of action was the proximate cause of any alleged delay in Plaintiff's surgery. To defeat summary judgment, sweeping conclusory allegations will not suffice; the plaintiff must instead "set forth specific facts as to each individual defendant's" actions which violated his or her rights. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). Taking all the facts in the light most favorable to Plaintiff, there is an absence of evidence that Defendants exhibited deliberate indifference. The undisputed evidence shows that Dr. Ahmed followed-up on the status of Plaintiff's surgery on September 15 and September 30, 2008, and that Plaintiff returned to Natividad for a pre-surgery appointment on October 8, 2008. There is an absence of evidence that any purported delay from September 30, 2008, until his surgery in December 2008 was proximately caused by Defendants. *See id.* Indeed, Plaintiff conceded that although the evidence shows that he did not receive surgery for nine weeks after he returned to the care of Dr.

---

[4] Although Dr. Chudy is an unserved Defendant, the Court sua sponte grants judgment in favor of Dr. Chudy. *See Silverton v. Dep't of Treasury*, 644 F.2d 1341, 1345 (9th Cir. 1981) (holding district court on its own motion may grant motion to dismiss as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants).

Ahmed, Plaintiff provided no evidence showing that Dr. Ahmed – or the other Defendants – proximately caused the delay. (Pl. Depo. at 91.) Further, Plaintiff does not allege that he was harmed by any delay from September 30, 2008, through December 11, 2008 when he received the surgery. *See McGuckin*, 974 F.2d at 1060 (recognizing that for a deliberate indifference claim, there must be a purposeful act and a resulting harm); *Walker*, 293 F.3d at 1038. Accordingly, Defendants are entitled summary judgment on the portion of Plaintiff's claim regarding a delay in surgery.

### B. Retaliation

Plaintiff alleges that Dr. Ahmed unlawfully retaliated against Plaintiff in two ways. First, Plaintiff claims that Dr. Ahmed threatened Plaintiff with a disciplinary report if Plaintiff filed a grievance against him. Second, Plaintiff claims that Dr. Ahmed delayed Plaintiff's surgery by nine weeks in retaliation for Plaintiff's August 14, 2008 grievance against him.

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). Moreover, a prisoner must at least allege that he suffered harm, since harm that is more than minimal will almost always have a chilling effect. *Id.* at 567-68 n.11.

Regarding Plaintiff's first claim, according to Plaintiff, he was frustrated that Dr. Ahmed refused to examine him on July 17, 2008. Plaintiff threatened Dr. Ahmed that he intended to file an administrative grievance against him. According to Plaintiff, Dr. Ahmed responded that if Plaintiff wrote up a grievance, Dr. Ahmed would file a disciplinary report against Plaintiff. In this claim, Plaintiff has failed to allege that he suffered any harm. *See id*; *Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000) (holding that a retaliation claim is not actionable unless there is an allegation of harm). Further, while the right of access to the courts extends to established prison grievance procedures, *see Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995), a mere threat to

use the prison grievance procedure is not protected conduct. Finally, the Ninth Circuit has held that mere threats or allegations that a naked threat was for purpose of denying access to courts do not constitute constitutional wrong. *See Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (per curiam) (affirming the dismissal of a claim alleging that an inmate was threatened with bodily harm in an effort to convince him from pursuing legal remedies).

Regarding Plaintiff's allegation that Dr. Ahmed retaliated against him by delaying Plaintiff's surgery, again Plaintiff has failed to demonstrate or allege that he was harmed by this delay. Moreover, Plaintiff's allegation that Defendants took an adverse action against Plaintiff, i.e., that they delayed Plaintiff's appendectomy surgery, is wholly conclusory and not sufficient to create a genuine issue of disputed fact. Finally, as stated above, there is no evidence that Defendants proximately caused any delay in surgery.

Accordingly, the Court GRANTS Defendants' motion for summary judgment on this claim.

III.    Referral to Pro Se Prisoner Settlement Program

Prior to setting this matter for trial and appointing pro bono counsel to represent Plaintiff for that purpose, the Court finds good cause to refer this matter to Judge Vadas pursuant to the Pro Se Prisoner Settlement Program for settlement proceedings on the claim set forth above. The proceedings will consist of one or more conferences as determined by Judge Vadas. The conferences shall be conducted with Dr. Ahmed, or his representative, attending by videoconferencing if they so choose. If these settlement proceedings do not resolve this matter, the Court will then set this matter for trial and consider a motion from Plaintiff for appointment of counsel.

**CONCLUSION**

1.    Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Defendants Dr. Sepulveda and Dr. Chudy are DISMISSED. Plaintiff's retaliation claim is DISMISSED.

2.    The instant case is REFERRED to Judge Vadas pursuant to the Pro Se Prisoner

1 Settlement Program for settlement proceedings on the remaining claim in this action, as
2 described above. The proceedings shall take place within **one-hundred twenty (120) days** of
3 the filing date of this order. Judge Vadas shall coordinate a time and date for a settlement
4 conference with all interested parties or their representatives and, within **ten (10) days** after the
5 conclusion of the settlement proceedings, file with the Court a report regarding the prisoner
6 settlement proceedings. If these settlement proceedings to do not resolve this matter, Plaintiff
7 can file a renewed motion for appointment of counsel, and the Court will then set this matter for
8 trial.

9     3.    The Clerk of the Court shall mail a copy of the Court file, including a copy of
10 this order, to Judge Vadas in Eureka, California.

11     4.    The instant case is STAYED pending the settlement conference proceedings.
12     IT IS SO ORDERED.
13 DATED: __9/9/12__

                                          LUCY H. KOH
14                                           United States District Judge

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring Case to Pro Se
Prisoner Settlement Program
G:\PRO-SE\SJ.LHK\CR.10\Gonzalez654msjdeny.wpd   15